# In the United States Court of Federal Claims

No. 18-1563
Filed: April 1, 2019
Reissued: April 22, 2019[1]

|  |  |  |
|---|---|---|
| INDIGO IT, LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | Bid Protest, RCFC 52.1, Cost Realism Analysis. |
| Defendant, | ) | |
| and | ) | |
| FEDITC, LLC, | ) | |
| Defendant-Intervenor. | ) | |

*Lars E. Anderson*, Odin, Feldman & Pittleman, Reston, VA, for plaintiff.

*Barbara E. Thomas*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Jeffery M. Chiow*, Rogers Joseph O'Donnell, PC, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SMITH, Senior Judge**

This post-award bid protest comes before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, Indigo IT, LLC ("Indigo"), filed its Complaint on October 9, 2018, objecting to the United States Defense Information Services Agency's ("DISA" or "Agency") award of Solicitation No. HC1028-15-R-0030 ("Solicitation" or "RFP"). Administrative Record (hereinafter "AR") 1. Indigo seeks an order (1) requiring the Agency to "conduct an evaluation of Indigo IT's proposed costs that is consistent with the Solicitation and the" Federal Acquisition Regulations ("FAR"), and (2) "award[ing] a contract" to plaintiff under the Solicitation. Plaintiff's Motion for Judgment on the Administrative Record

---

[1]     An unredacted version of this opinion was issued under seal on April 1, 2019. The parties were given an opportunity to propose redactions, and those redactions are reflected herein.

(hereinafter "Pl.'s MJAR.") at 1.  For the following reasons, plaintiff's Motion for Judgment on the Administrative Record is denied, and defendant's Cross-Motion for Judgment upon the Administrative Record is granted.

## I.      Background

On March 2, 2016, the Agency issued the Solicitation for the ENCORE III IT Solutions procurement, a follow-on to the ENCORE II contract.  AR 1.  The Solicitation sought to meet the Department of Defense's ("DoD") effort to "achieve information superiority" by providing information technology ("IT") solutions to the military service branches, the DoD, and other federal agencies.  *Id.* at 1784.  Specifically, the Solicitation called for offerors to assist the DoD in the "development, installation, fielding, training, operation, and life-cycle management of [IT] components and systems in the operational environments of Combatant Commands and their subordinate components" in nineteen possible "performance areas," which ranged from information and knowledge management, to business process re-engineering, to computer-technology integration.  *Id.* at 1785–86.

The Solicitation included a small business suite based upon a "best value, lowest price, technically acceptable source selection conducted in accordance" with the FAR, whereby the Agency would award up to twenty Indefinite-Delivery/Indefinite Quantity ("ID/IQ") contracts, with both firm Fixed Price ("FP") and Cost Reimbursable ("CR") type task orders.  *Id.* at 1781, 1891, 1909.  Awardees were not automatically awarded task orders, but instead were afforded a "fair opportunity to be considered for specific task and delivery orders issued against the ENCORE III contract."  *Id.*  DISA was authorized to award $17,500,000,000.00 over ten years, to be divided into two five-year terms.  *Id.* at 1782.

The Agency chose awardees based on three sets of evaluation factors: (1) Technical/Management Approach; (2) Past Performance; and (3) Cost/Price.  AR 1899–1901. The Cost/Price factor, at issue in this case, contained several additional requirements, including: (1) price narrative; (2) pricing spreadsheet; (3) accounting system verification; and (4) uncompensated overtime policy, if applicable.  *Id.* at 1901.  The price narrative was to contain information on "[p]ricing methodology and all supporting cost information of [CR] labor rates. *Id.* at 1901.  Offerors were to include "labor and overhead rates" that could "sustain a Defense Contract Audit Agency audit" and "pricing methodology and supporting cost information utilized in the development of all CR rates."  *Id.* at 1902–03.

For the pricing spreadsheet, offerors were required to differentiate between FP and CR labor rates for all 116 labor categories ("LCAT").  *Id.* at 1902.  CR rates needed to include direct and indirect rates, as well as a mandated 5.5% fixed fee, for both the government site and contractor site categories.  *Id.*  For direct labor rates—the actual proposed hourly compensation—offerors were to include information such as "payroll records [and] salary survey data."  AR 1902.  Indirect labor rates—those additional costs separate from direct compensation—could be justified either through submitting a Forward Pricing Rate Agreement, or Forward Pricing Rate Recommendation, or by submitting a Forward Pricing Rate Proposal that included the "basis for these rates and factors."  *Id.*

The Solicitation also outlined how the Agency would evaluate offers.  After calculating the rates for each LCAT and increasing the rate for each year beyond the first year, Agency evaluators multiplied the LCAT total by the hours required at both government and contractor sites, reaching the total amount for each LCAT per year.  *Id*. at 1902, 1910.  The sum of all LCATs over the lifetime of the contract yielded each offeror's "Total Proposed Price."  *Id*. at 1910.

For the CR portion of the Solicitation, the Agency was required to use "one or more techniques in FAR 15.404 in order to determine if [the CR portion of the offerors' TPPs] are complete, reasonable, and realistic."  *Id*. at 1910, 1918–19.  Cost realism required the calculation of a "Most Probable Cost . . . for the CR portion of [each] proposal."  *Id*. at 1919.  In order to ascertain the Most Probable Cost for the CR portion of each proposal, the cost/price team calculated the average of all CR rates proposed by all offerors within the small business suite for each LCAT.  *See* AR 1919.  The cost/price team would then calculate the dollar amount that fell one standard deviation below each average rate for every LCAT.  *See Id*.

The Agency also conducted a cost realism analysis for each offeror, in accordance with the terms of the Solicitation, depending on the rate of each LCAT within an offeror's proposal.  *Id*. at 1918–19.  The cost/price team "consider[ed] a rate that is 1 standard deviation below the average to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404."  *Id*. at 1919.  Rates falling *below* that range required evaluators to "review the submitted supporting documentation at the component level for that rate."  *Id*.  If the supporting documentation provided "inadequate or no justification . . . for any component of that rate," the evaluators "adjust[ed] the fully burdened CR labor rate to be equal to the average for purposes of calculating the Most Probable Cost for that offeror."  *Id*.  If the offeror provided adequate supporting documentation, then the rate would not be adjusted.  *Id*.  Once cost-realism analysis was completed and required rates adjusted, the Agency calculated "a total Most Probable Cost for the CR only portion of the proposal for each offeror by applying Government[-]estimated labor hours for each year of contract performance to each offeror's most probable cost labor rates" for all LCATs.  *Id*.

After completing the cost/price evaluation, the Agency was directed to calculate the Total Evaluated Price ("TEP") by adding the "Total Proposed Price for the FP portion of the proposal to the Most Probable Cost for the CR portion of the proposal."  AR 1919.  The offerors with the twenty lowest TEPs in each suite were then evaluated for "compliance with other terms and conditions" outlined in the Solicitation.  *Id*. at 1910, 1920.  After offerors submitted their initial proposals, the Agency determined a competitive range of thirty offers.  *Id*. at 79515.  The Agency engaged in four rounds of Evaluation Notices ("EN") between September 25, 2017 and April 24, 2018, with a Final Proposed Revision ("FPR") deadline of May 2, 2018.  *Id*. at 78208, 67599.

Throughout the proposal and evaluation process, DISA assessed each updated proposal in turn, and plaintiff responded to each of the Agency's evaluations.  *See id*. at 3719–24, 8724–32, 15218–47, 24240–48, 30838–58, 44105–08, 49761–71, 57969–78, 58067–70, 68247–48, 71695–98.  During the first round of ENs, the Agency highlighted what it saw as a failure to "provide adequate supporting cost information to verify their proposed direct labor rates."  *Id*. at 8729.

DISA noted continued inadequacies with the supporting information for plaintiff's CR direct rates in its second revised proposal. AR 30839.  Plaintiff then provided additional documentation with its third proposal revision. *Id*. at 30838–54.  The Agency determined that plaintiff had provided adequate support for its indirect labor rates but not for its direct labor rates. *Id*. at 38422.  During the fourth round of evaluations, the Agency reiterated its concern that plaintiff provided "no supporting rationale" for its direct labor rates. *Id*. at 49765.

Plaintiff then submitted its FPR on May 2, 2018. *Id*. at 58067.  After reviewing offeror FPRs, DISA concluded that issuing an additional round of ENs was necessary to "address[] outstanding issues," and set a June 20, 2018 deadline for revised FPRs. AR 79515.  In its final EN, DISA again renewed its concerns regarding plaintiff's "failure to provide adequate supporting cost information to justify percentile adjustments" to its direct labor rates, and noted that plaintiff "did not provide adequate supporting cost information to verify their proposed indirect rates." *Id*. at 66927.  The Agency allowed plaintiff the opportunity to provide supporting information. *Id*.

In its ENs, the Agency requested that plaintiff "remove the unsupported percentile adjustments or provide detailed documentation to support" plaintiff's direct labor rate estimates and requested that plaintiff "provide more detailed rate calculations" for its indirect labor rate estimates. *Id*. at 71669, 71692.  Plaintiff then submitted its revised FPR on June 20, 2018. *Id*. at 71695–98.  The Agency evaluated that FPR and found "outstanding realism concerns" with plaintiff's direct labor rates, while noting that plaintiff "did not provide adequate supporting cost information" to justify its percentile adjustments. *Id*. at 78205.

The Agency's cost realism evaluation also reflected concerns with plaintiff's indirect rates. *See* AR 78205, 78213.  The Agency pointed to a discrepancy between the "supporting pools and bases," which justified an "[o]verhead rate of ██ %," while plaintiff "proposed an overhead rate of ██% for Government sites, and an overhead rate of ██% for contractor site." *Id*. at 78205.  DISA concluded that plaintiff had not provided "adequate support" for aspects of its indirect labor rates, including overhead rates. *Id*.

Citing "outstanding realism concerns," the Agency then "fully adjust[ed]…to the average" those unjustified direct and indirect rates to establish plaintiff's Most Probable Cost ("MPC"). *Id*. at 78205, 78208.  DISA upwardly adjusted plaintiff's MPC by $288,081,629, resulting in a final TEP of ████████.  *Id*. at 78206, 78208.  On August 24, 2018, the Agency announced the twenty awardees in the small business set-aside suite for ENCORE III. AR at 79526–27.  Indigo was not among the twenty awardees, ranking twenty-third lowest. *Id*. at 79508.

On October 9, 2018, plaintiff filed its Complaint. *See generally* Compl.  In its Complaint, plaintiff alleges, the following: (1) the Agency's "cost realism analysis did not conform to the terms of the Solicitation or with the [FAR]"; and (2) the Agency "arbitrarily and unreasonably failed to follow the Solicitation's evaluation criteria by requiring justification for costs within one standard deviation of the average." *Id*. at 10, 11.  On November 20, 2018, plaintiff filed its Motion for Judgment on the Administrative Record, and Plaintiff's Memorandum in Support of its Motion for Judgment on the Administrative Record. *See generally* Pl.'s MJAR; Plaintiff's Memorandum in Support of its Motion for Judgment on the

Administrative Record (hereinafter "Pl.'s Mem."). On December 18, 2018, defendant filed its Opposition to Plaintiff's Motion for Judgment upon the Administrative Record and Cross-Motion for Judgment upon the Administrative Record. *See generally* Defendant's Opposition to Plaintiff's Motion for Judgment upon the Administrative Record and Cross-Motion for Judgment upon the Administrative Record (hereinafter "Def.'s CMJAR").

On January 4, 2019, plaintiff filed its Reply and Opposition to defendant's Motion for Judgment on the Administrative Record. *See generally* Plaintiff's Reply and Opposition to the defendant's Motion for Judgment on the Administrative Record (hereinafter "Pl.'s Reply"). On January 18, 2019, defendant filed its Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record. *See generally* Defendant's Reply in Support of its Cross-Motion for Judgment Upon the Administrative Record. Pursuant to the Court's November 6, 2018 Order, FEDITC, LLC was included in this litigation as a non-participating defendant-intervenor. *See* Order granting Motion to Intervene (with restrictions), Dkt. No. 21. The Court held oral argument on January 31, 2019. The parties' motions are fully briefed and ripe for review.

## II. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Although the Tucker Act expressly waives the sovereign immunity of the United States against such claims, the act "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Rather, in order to fall within the scope of the Tucker Act, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc* in relevant part).

This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b). The Court evaluates bid protests under the standard of review for an agency action set forth in the Administrative Procedure Act ("APA"). *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). An agency procurement action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A) (2012). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts v. United States,* 216 F.3d 1054, 1058 (Fed. Cir. 2000). Agencies, and contracting officers in particular, are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Savantage Fin. Servs v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Impresa*, 238 F.3d at 1332).

When reviewing a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), the Court assesses whether the administrative body, given all the disputed and undisputed facts in the record, acted

in a manner that complied with the legal standards governing the decision under review.
*Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013) (citing *Fort Carson
Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006); *Greene v. United States*, 65 Fed. Cl.
375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005)).  Under RCFC
52.1, the parties are limited to the Administrative Record, and the Court makes findings of fact
as if it were conducting a trial on a paper record.  *See Bannum*, 404 F.3d at 1354.  Looking to the
Administrative Record, the Court must determine whether a party has met its burden of proof
based on the evidence in the record.  *Id.* at 1355.

When a protestor claims that the agency's decision violates a statute, regulation, or
procedure, the protestor must show that the violation was "clear and prejudicial."  *Impresa*, 238
F.3d at 1333.  The Court will "interfere with the government procurement process only in
extremely limited circumstances."  *EP Prods., Inc. v. United States,* 63 Fed. Cl. 220, 223 (2005)
(quoting *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed. Cir. 1983)).  If a court
"finds a reasonable basis for the agency's action, the court should stay its hand even though it
might, as an original proposition, have reached a different conclusion as to the proper
administration and application of the procurement regulations."  *Honeywell, Inc. v. United
States,* 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d
1289, 1301 (D.C. Cir. 1971)).  The Court cannot substitute its judgment for that of the agency,
even if reasonable minds could reach differing conclusions.  *Bowman Transp., Inc. v. Ark.-Best
Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).

## III.    Discussion

In its Memorandum in Support of its Motion for Judgment on the Administrative Record,
plaintiff alleges that the Agency's cost realism analysis failed to comply with the FAR or the
Solicitation.  Pl.'s Mem. at 26.  Plaintiff makes three specific arguments.  First, plaintiff contends
that DISA "improperly adjusted upward" plaintiff's CR labor rates that were below, but within
one standard deviation, of the average ("within-deviation rates").  *Id.* at 28.  Plaintiff states that
the Solicitation limited the Agency's ability to adjust rates upward to only those rates that fell
below one standard deviation of the average ("below-deviation rates"), and only "that [specific]
rate."  *Id.* at 29 (citing AR 1919).  According to plaintiff, the Solicitation also "articulates how to
identify costs that [fall] within a normal distribution, and, thus, [are] realistic."  *Id.*  Given these
conditions, plaintiff argues that, when DISA adjusted plaintiff's CR labor rates upward, the
Agency violated the Solicitation, which limited the Agency to only adjusting the below-deviation
rates, because within-deviation rates were presumed realistic.  *Id.*

Second, plaintiff argues that DISA "improperly failed to comply with FAR 15.404-
1(d)(2)(ii)" in not reducing plaintiff's CR labor rates that were more than one standard deviation
above the average ("above-deviation rates").  *Id.* at 33 (citing 48 C.F.R. § 15.404 (2017)).  The
Solicitation required the Agency to adjust "each offeror's proposed cost . . . to reflect any
additions or reductions in cost elements to realistic levels based on the results of the cost realism
analysis."  C.F.R. § 15.404-1(d)(2)(ii).  Plaintiff argues that the Agency's failure to "adhere to
this regulation . . . unrealistically inflated" plaintiff's offer.  Pl.'s Mem. at 33.

Third, Indigo contends that the Agency "unjustifiably prejudiced" plaintiff when it "utilized an arbitrary review process" in analyzing plaintiff's methodology for generating survey results for its CR direct and indirect labor rates. *Id.* at 35. Plaintiff points to examples where the Agency adjusted plaintiff's direct rates upward but declined to raise the direct rates of other offerors with lower direct rates within the same LCAT. *Id.* at 37–38. Indigo concludes that the difference in treatment of offerors' direct rates represent "significant discrepancies" in DISA's cost realism analysis, and "directly contravene a reasonably adequate methodology." *Id.* at 38 (internal quotations removed). Plaintiff similarly argues that the Agency arbitrarily determined that the indirect labor rates in its first FRP were unrealistic, noting that DISA "determined that Indigo IT's rates should be increased" despite the fact that "the Agency [failed to] specify why the overhead rates were unrealistic." *Id.* at 39. As discussed earlier, the Agency noted a discrepancy between plaintiff's indirect labor rates and the documentation supporting those rates. *See* AR 78205, 78213. As a result, the Agency found that plaintiff had not provided "adequate support" for aspects of its indirect labor rates, and adjusted upward plaintiff's MPC. *Id.* at 78206, 78208. The Court is unpersuaded by plaintiff's interpretation of the Solicitation, its framing of FAR 15.404-1(d), or its understanding of the Agency's cost realism analysis.

### A. Within-Deviation Rates

Plaintiff's first argument is that its within-deviation rates were arbitrarily increased, which violated the terms of the Solicitation and the FAR. *Id.* at 28. Defendant responds by arguing that the Solicitation "unambiguously reserved" the Agency's right to "conduct cost realism analysis" in accordance with FAR 15.404-1. Def.'s CMJAR. at 34. The Court is not persuaded by the plaintiff's argument that the Agency inappropriately adjusted Indigo's within-deviation rates.

An agency's discretion in evaluating cost realism "'is bounded by the evaluation criteria stated in the solicitation' and any methodology to which the agency otherwise commits therein." *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 379 (2010) (quoting *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 (2010)). The applicable test for an agency's violation of the evaluation criteria is found in *Beta Analytics International Incorporated v. United States*. 44 Fed. Cl. 131 (1999). This test states that "if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award." *Beta Analytics*, 44 Fed. Cl. at 138.

The Solicitation, in turn, details a framework for how the Agency should analyze CR labor rates. *See* AR 1918–19. Rates below one standard deviation from the average required Agency review. *See id.* at 1919. If the supporting documentation justified the rate, the rate was not adjusted, but below-deviation rates were adjusted upward. *Id.* If the rate was within "1 standard deviation below the average" the Agency would "consider" that rate "to be a realistic rate, subject to cost analysis techniques in accordance with FAR 15.404." *Id.* Alternatively, rates more than one standard deviation below the average received automatic review, and rates within the standard deviation range were presumed realistic but subject to a discretionary cost realism analysis pursuant to FAR 15.404. *Id.*; *see generally* 48 C.F.R. § 15.404.

FAR 15.404 states the following:

> Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal . . . . Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror . . . . The probable cost may differ from the proposed cost and should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal. The probable cost shall be used for purposes of evaluation to determine the best value . . . . The probable cost is determined by adjusting each offeror's proposed cost, and fee when appropriate, to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis.

48 C.F.R. § 15.404-1(d)(1)–(2). The FAR defines "cost analysis" as "the review and evaluation of the separate cost elements and profit in an offeror's or contractor's proposal (including cost or pricing data or information other than cost or pricing data), and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency." *Id.* § 15.404-1(c)(1).

In making its argument that its within-deviation rates were arbitrarily increased, plaintiff rests on an inaccurate reading of the terms of the Solicitation. The relevant portion of the Solicitation states that the Agency "*considers* a rate that is 1 standard deviation below the average to be a realistic rate, *subject to* cost analysis techniques in accordance with FAR 15.404." *Id.* (emphasis added). Plaintiff suggests that within-deviation rates were presumed realistic and, therefore, not subject to a cost realism analysis. Pl.'s Mem. at 29.

The Court agrees with defendant's understanding of the Solicitation's terms and interprets those terms to mean that within-deviation rates were presumed realistic, but that DISA retained the discretionary authority to analyze the realism of *any* labor rate below the average, so long as its analysis conforms to the FAR. After conducting appropriate cost realism analyses during EN rounds, the Agency determined that plaintiff's methodology for arriving at its below-deviation rates was faulty, and, as a result, the Agency reviewed plaintiff's within-deviation rates in accordance with section M5 of the Solicitation and section 15.404-1(d) of the FAR. *See* AR 1918–20, 30839, 4976, 66927, 78204–05; 48 C.F.R. § 15.404-1(d). Through that analysis, the Agency determined that plaintiff's within-deviation rates were unrealistic and adjusted those rates upward to the average for each respective LCAT. AR 78204, 78206.

After careful review, the Court does not believe that the Agency's decision to raise plaintiff's within-deviation labor rates resulted in a failure "to abide by a mandatory solicitation provision" standard established by the Court in *Beta Analytics.* 44 Fed. Cl. at 138. The Agency's evaluation process was consistent with the terms of the Solicitation and the FAR. As such, the Court finds that such an evaluation was neither arbitrary nor capricious.

**B.  Above-Deviation Rates**

In addition to its arguments regarding the below-deviation rates, plaintiff contends that the Solicitation required the Agency to adjust its above-deviation rates downward to the average. Pl.'s Mem. at 33.  FAR 15.404 directs the Agency to make "any additions or reductions in cost elements to realistic levels *based on the results of the cost realism analysis*."  48 C.F.R. § 15.404-1(d)(1)(2) (emphasis added).  Plaintiff interprets this language to mean that the Agency acted unreasonably in failing to adjust its above-deviation rates down to the average labor rate for the corresponding LCATs.  Pl.'s Mem. at 33.  Defendant responds, arguing that plaintiff "points to no evidence that DISA ever determined that the [above-average] rates were not at a 'realistic level[].'"  Def.'s CMJAR at 37 (citing 48 C.F.R. § 15.404-1(d)(2)(ii)).

The Court agrees with defendant's analysis.  Contrary to plaintiff's understanding, the Agency was not obligated to adjust plaintiff's above-deviation rates downward, as such an adjustment was only required, by the Solicitation and in accordance with FAR 15.404-1(d)(1)(2), if the Agency determined that those rates were unrealistic.  AR 1919; 48 C.F.R. § 15.404-1(d)(2)(ii).  The Agency never determined that those rates were unrealistic, and the Solicitation left the adjustment of realistic rates to the Agency's discretion.  *See* AR 78203–06; AR 1918–19.  Looking to the record as a whole, it seems to the Court that the Agency's decision to not reduce plaintiff's above-deviation rates was entirely consistent with both FAR 15.404-1(d)(2)(ii) and the Solicitation.

The Court would further note that in a competitive bid context, the bidder has strong incentive to never over-price, for fear of losing the contract.  Low bids, on the other hand, present the opposite incentive, as well as a danger to the government of unanticipated costs in CR contract situations.  As such, plaintiff has not met its burden in accordance with the test found in *Beta Analytics*, 44 Fed. Cl. at 138, and the Court finds the Agency's actions were neither arbitrary nor capricious.

**C.  Cost Evaluation Methodology**

Finally, plaintiff argues that a "review of the Record shows significant discrepancies in the evaluation of offerors that directly contravene" a reasonable cost evaluation; the Agency's evaluation methodology defied "rational decision making"; and plaintiff was "prejudiced by DISA's disparate cost realism analysis."  Pl.'s Mem. at 37–38; Pl.'s Reply at 22–23.  Defendant alleges that plaintiff cannot show "that the agency's analysis lacked a rational basis," before analyzing the Agency's cost realism analysis.  Def.'s CMJAR at 38, 39–45.  The Court does not believe that either the Agency's cost realism analysis or evaluation process was unreasonable, and even if disparate treatment had occurred, the Court will not set aside an award unless the plaintiff has shown that it was prejudiced by the allegedly unequal treatment.  *See Worldwide Language Res., LLC v. United States*, 127 Fed. Cl. 125, 135 (2016) (rejecting plaintiff's claim because it could not show prejudice).  The record demonstrates that the Agency's cost evaluation was reasonable, and conformed to the Solicitation and the FAR.  *See* AR 23114–17, 48785, 77474–88, 78200–13, 79004–23.

Further, the plaintiff showed no evidence of unfair or disparate treatment.  Of course, the cost estimates of different contractors were analyzed somewhat differently, because they all used different estimates based on different factual assumptions about the labor locations, skills mix, and wage and benefit rates.  But the government methodology was the same.  As such, the Court finds the Agency's did not engage in an unreasonable cost evaluation in analyzing plaintiff's proposal.

Furthermore, the record reflects that the Agency implemented reasonable control measures to ensure that offeror labor rates conformed to the terms of the Solicitation, the Agency relied upon offeror submissions to perform its analysis, and, therefore, the Agency came to appropriate conclusions regarding offeror price.  *See, e.g.,* AR 74345–73; 74539–58; 74869–82; 79077–92; 77200–16; 78200–13.  Nothing in the record supports plaintiff's proposition that prejudice arose out of the Agency's actions.  It appears to the Court that the Agency's cost realism analyses, as well as the evaluation process, for both direct and indirect labor rates were reasonable and not in violation of the Solicitation's terms.

At its core, plaintiff's argument is an objection to the way in which the Agency evaluated its cost proposals.  Though plaintiff may disagree with the Agency's analytic methodology, nothing in the record indicates that DISA's cost realism analysis or evaluation processes violated either the FAR or the terms of the Solicitation.  Looking to the record as a whole, the Court finds that the Agency's evaluation process was reasonable.  Finally, as there is a rational basis for the Agency's evaluation of proposals, the Court will not infringe upon the Agency's discretion in performing that evaluation.  Plaintiff has not demonstrated that that the Agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 28 U.S.C. § 1491(b)(4); *Bannum*, 404 F.3d at 1355, and the Court will not set aside the Agency's rational award decision.

## IV.    Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**.  Defendant's CROSS-MOTION for Judgment on the Administrative Record is **GRANTED**.  The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge